```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION

Aplonda R. Murphy,               :

        Plaintiff,               :

     v.                          :    Case No. 2:13-cv-730

                                 :    JUDGE ALGENON L. MARBLEY
Commissioner of Social Security,      Magistrate Judge Kemp

        Defendant.               :
```

## REPORT AND RECOMMENDATION

### I.  Introduction

Plaintiff, Aplonda R. Murphy, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income.  Those applications were filed on May 18, 2009, and alleged that Plaintiff became disabled on March 21, 2007.

   After initial administrative denials of her applications, Plaintiff was given a videoconference hearing before an Administrative Law Judge on January 17, 2012.  In a decision dated January 23, 2012, the ALJ denied benefits.  That became the Commissioner's final decision on May 30, 2013, when the Appeals Council denied review.

   After Plaintiff filed this case, the Commissioner filed the administrative record on December 4, 2013.  Plaintiff filed her statement of specific errors on January 21, 2014, to which the Commissioner responded on March 21, 2014.  Plaintiff filed a reply on April 10, 2014, and the case is now ready to decide.

### II.  Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 45 years old at the time of the administrative hearings and has a high school education,

testified as follows.  Her testimony appears at pages 41-66 of the administrative record.

     Plaintiff testified that she used a cane or a walker to get around her house and also used the walker when she went out.  She had a home health aide come to her house five days a week to assist her with getting dressed, taking her medicine, and going to medical appointments.  The aide and Plaintiff's daughter divided the cooking responsibilities and also assisted in paying bills.

     In terms of physical activity, Plaintiff testified that she could stand for five minutes at a time and could sit for thirty minutes before experiencing numbness in her leg.  She believed that her psychological condition, which included hearing voices, was the primary reason she could not work.

     The last time Plaintiff had a job was when she worked as a food service driver.  She injured her hip at that job when she lifted a food warmer.  She has since had both hips replaced.  She described a history of substance abuse, primarily marijuana, but had been sober for four years at the time of the hearing.  Between her primary care doctor, her bone doctor, and others, she attended six or seven medical appointments each month.

     When asked to describe her pain, Plaintiff said it was a throbbing, constant pain which worsens with bad weather or stress.  In a typical day she takes medication, watches television, and occasionally fixes a sandwich.  She had been taking courses on line, but generally failed them and incurred some student loan debt.  She also confirmed that she had worked a number of different jobs in the past such as a child care giver, a cashier, and an assistant teacher at a school for disabled children.  She said she might be able to do a sedentary job in a relaxed environment if she could get up and stretch once in a while.

### III. The Medical Records

The medical records in this case are found beginning on page 243 of the administrative record. The pertinent records can be summarized as follows.

Dr. Greer, a psychologist, completed a form on June 23, 2009, stating that Plaintiff had made two appointments to see him that year but kept neither one. When he last saw her, in 2005, she was only slightly impaired from a psychological viewpoint, and suffered from an adjustment disorder with depressed mood. (Tr. 243-45).

Next, Plaintiff's chiropractor, Elizabeth Schrickel, reported on March 8, 2008, that Plaintiff slipped and fell while chasing a child on a muddy hill. She broke her ankle and had physical therapy for a year. When seen, she still had moderate swelling and tenderness in the ankle with pain. (Tr. 246-47). It appears that the injury occurred in 2000. See Tr. 256.

Plaintiff was seen at the OSU clinic on March 12, 2009, for consultation about a hip replacement. She reported a five-year history of hip pain. At that time, she described herself as a full-time student. X-rays showed severe degenerative changes in the right hip. She was scheduled for a total hip replacement several months later. (Tr. 264-65).

Dr. Weaver, a psychologist, performed a consultative examination on August 12, 2009. Plaintiff described a history of physical ailments and pain as well as hearing voices. She appeared to be illiterate. Her mood was tearful and she described depression and loss of interest as well as feelings of helplessness. She avoided people. Dr. Weaver diagnosed a pain disorder, PTSD, dysthymia, and panic with agoraphobia, and rated her GAF at 40. He thought she was markedly impaired in all areas of work-related functions. (Tr. 293-97). Dr. Williams, a state agency reviewer, disagreed, finding that Plaintiff's impairments

were no more than moderate, noting that Plaintiff's presentation to the case adjudicator and to Dr. Weaver were very different and that her activities of daily living were inconsistent with the marked impairments described by Dr. Weaver. Dr. Williams said that Plaintiff retained "the capacity to perform simple repetitive tasks in a non public setting without strict production standards or quotas." (Tr. 329-46). Plaintiff did get some counseling in 2010, with her psychologist, Dr. Mason, reporting in June of that year that Plaintiff had inconsistently attended counseling sessions, was complaining of auditory hallucinations, had a long history of substance abuse and addiction, tested positively for confusion and disorientation, had a "clear pattern of psychosis," and could not ever be gainfully employed. (Tr. 375-77). Subsequent counseling notes showed improvement in her symptoms, however, with medication being effective to control but not eliminate her symptoms. Dr. Lee, who signed a form directed to Dr. Basobas and Ms. Perry, reported on September 23, 2011 that Plaintiff suffered from a psychotic disorder not otherwise specified, that her GAF was 55, that her prognosis was poor, and that she had marked limitations in the areas of understanding, remembering, and carrying out detailed instructions, in maintaining a schedule, and in dealing with supervisors or responding to changes in the work setting, and extreme limitations in maintaining attention and concentration and completing a work day or week without interruptions from psychologically-based symptoms. She would also miss five or more days per month due to psychological symptoms. (Tr. 615-20).

    Plaintiff had hip replacement surgery in September, 2009. At a follow-up visit in October of that year, the new hip was stable. (Tr. 307). Dr. Cho, a state agency reviewer, concluded from the records predating the hip replacement that Plaintiff

-4-

could do sedentary work with some postural restrictions. (Tr. 347-54). Plaintiff had her other hip replaced in 2010 due to end stage bone-on-bone osteoarthritis.

IV.  The Vocational Testimony

William J. Kiger, a vocational specialist, was the vocational expert in this case. His testimony appears at pages 66-71 of the administrative record.

Mr. Kiger testified that Plaintiff's past jobs were considered to be food deliverer, a medium, unskilled position, and day care worker, which was light and semi-skilled.

Mr. Kiger was then asked some questions about a hypothetical person who was a younger individual and had an advanced education. That person could do a wide range of sedentary work, lifting ten pounds both occasionally and frequently, could sit for six hours in a work day and stand or walk for two hours, and was limited to the performance of simple, routine, repetitive work in a low stress environment requiring only few decisions and involving limited interaction with co-workers and supervisors. Also, the person could have no contact with the general public. The person could also occasionally crawl, crouch, stoop, kneel, climb stairs or ramps, and balance. He or she could not be required to meet production quotas and could not push or pull at all with the right leg, and only occasionally with the left. Walking or standing was limited to 15-minute increments, and the person could not work around dangerous machinery or unprotected heights or be required to climb ladders, ropes or scaffolds. According to Mr. Kiger, someone with those restrictions could not perform any of Plaintiff's past relevant work.

In response to additional questioning, Mr. Kiger testified that such a person could perform unskilled sedentary jobs such as carding machine operator, waxer, or inspector. He also identified the number of such jobs in the local and state

economies.  If the person had to miss an average of four days of work per month due to medical issues, he or she would not be employable, and the same would be true for someone who would be off task for twenty percent of the time.  A person frequently unable to maintain attention for extended periods of time, to respond appropriately to co-workers and supervisors, to work around others, and to work without interruption from psychological symptoms was similarly unemployable.

V.   The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 10-29 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements for disability benefits through June 30, 2012.  Next, Plaintiff had not engaged in substantial gainful activity from March 21, 2007 forward.  As far as Plaintiff's impairments are concerned, the ALJ found that Plaintiff had severe impairments including morbid obesity, status post hip replacement with a generalized pain disorder, post-traumatic stress disorder, dysthymia, and panic disorder with agoraphobia.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the sedentary exertional level except she could only occasionally crawl, crouch, stoop, kneel, climb stairs, climb ramps, and balance, and she could never push or pull with the right lower extremity but could do so only occasionally with the left lower extremity.  She could perform only simple, routine, repetitious work with 1 or 2 step

instructions, was limited to a supervised, low stress environment requiring few decisions, was limited to only occasional interactions with co-workers and supervisors, could have no contact with the general public, could stand or walk in only 15 minute increments for a total of 2 hours in an eight-hour workday, and could not be exposed to hazards such as dangerous machinery, unprotected heights, scaffolding, ropes, or ladders. The ALJ found that, with these restrictions, Plaintiff could not perform her past relevant work, but she could perform the jobs identified by Mr. Kiger - specifically production worker/waxer, inspector, and carding machine operator - and that such jobs existed in significant numbers in the local and state economies (850 and 65,000, respectively).  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

>  VI.  Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises these issues: (1) the ALJ erred by not finding that Plaintiff suffered from a severe psychotic disorder with paranoid features; (2) the ALJ erred by not finding that Plaintiff's mental impairments satisfied the criteria of various sections of Section 12 of the Listing of Impairments; (3) the ALJ erred by not finding that Plaintiff's physical impairments satisfied either Section 1.02A or 1.03 of the Listing; and (4) the ALJ did not make a proper credibility finding.  The Court analyzes these claims under the following standard.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v.

NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. Severe Psychotic Disorder

Plaintiff first argues that, given the substantial evidence in the record of the existence of a psychotic disorder (the reports from Drs. Weaver, Mason, Lee, and North Community Counseling), it was error for the ALJ not to find this to be a severe impairment. Especially given the low threshold for determining "severity," she contends that these opinions, which were supported by diagnostic evidence and by the balance of the records, should have been accorded great weight on this issue, and the ALJ erred by finding otherwise. The Commissioner responds that even if some error was made at this step of the process, the error was harmless because the ALJ went on to consider the evidence of psychological impairments and their resulting limitations at step four, when he determined Plaintiff's residual functional capacity.

It is somewhat curious that despite the amount of evidence in the record concerning a possible psychotic disorder, that was not one of the impairments that the ALJ mentioned in his step two findings, even though he devoted a substantial amount of discussion to other non-severe impairments.  Nevertheless, the Commissioner is correct that the failure to characterize a particular impairment as "severe" is harmless if "the ALJ consider[s] all of [the claimant's] impairments in [the] residual functional capacity assessment finding ...." Pompa v. Comm'r of Social Security, 73 Fed. Appx. 801, *1 (6th Cir. Aug. 11, 2003); see also Taylor v. Astrue, 2012 WL 870770, *5 (S.D. Ohio March 14, 2012)(if the ALJ makes an error at step two, "the question becomes whether the effect of these [nonsevere] conditions was properly taken into account at step four of the process when the ALJ determined plaintiff's ... residual functional capacity"), adopted and affirmed 2012 WL 1268178 (S.D. Ohio April 13, 2012). The ALJ did so here, and, as a result, the ALJ's error (if there was one) at step two does not provide grounds for reversal or remand.

B.  The Listings for Mental Impairments

Next, Plaintiff argues that the ALJ erred by not finding that her psychological impairments met or equaled the criteria for disability set forth in various sections of the Listing of Impairments.  She focuses particularly on Sections 12.03, 12.04, and 12.06, noting that each shares the same "B criteria." The "B criteria" specify that a claimant is disabled if the impairment described in a section of the Listing to which those criteria apply has at least two of the following: (1) a marked impairment in activities of daily living, (2) a marked impairment in social functioning, (3) marked difficulties in maintaining concentration, persistence, or pace, and (4) repeated episodes of decompensation, each of extended duration.  Plaintiff contends that the evidence from Drs. Weaver, Lee, and Mason all support a

-9-

finding of at least two marked limitations in the areas addressed by the "B criteria," and that the ALJ should have so found.  The Commissioner responds that Plaintiff did not prove that she met the "A criteria" for Listings 12.03, 12.04, and 12.06, and that even if she did, the ALJ reasonably found that she did not satisfy the "B criteria."

As to both the "A" and "B" criteria, Plaintiff had the burden to show that her conditions were of Listing severity - that is, "[t]he burden of proof for establishing that an impairment meets or equals the requirements of a listed impairment rests with the claimant." Miller v. Comm'r of Social Security, 848 F.Supp.2d 694, 708 (E.D. Mich. 2011), citing Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001).  Consequently, the issue here is not whether the record contained evidence from which it could be inferred that Plaintiff's impairments met or equaled some section of the Listing, but whether the evidence was so compelling on that issue that no reasonable person could have found otherwise.

Plaintiff addresses the "A" criteria in her statement of errors simply by citing to evidence that would support a finding of their existence.  She does not refer to any countervailing evidence, nor does she discuss why that evidence would not have reasonably supported the ALJ's decision.  She advances much the same type of argument with respect to the "B" criteria, stating that there is evidence from both treating and examining sources that she is markedly limited in at least two of the functional areas addressed by those criteria.

The ALJ discussed only the "B" criteria in his decision, finding that Plaintiff did not have more than mild restrictions in her activities of daily living, and had only moderate restrictions in her social functioning and ability to maintain concentration, persistence, and pace.  The ALJ also found, and Plaintiff does not appear to dispute, that there is no evidence

in the record of any prolonged episodes of decompensation. Thus, the key issue is whether the ALJ had a reasonable basis for those findings.

Dr. Weaver specifically found marked impairments in the first three "B" criteria. Dr. Mason did not couch his opinion in those terms, but he did say that Plaintiff was "ill equipped to deal with her social environment ...." (Tr. 376). Dr. Lee noted extreme limitations in the area of maintaining concentration, but only one marked restriction in the area of social interaction (responding appropriately to supervisors), and he did not directly address activities of daily living other than to state that Plaintiff's symptoms (hallucinations, mood swings, and negative reaction to stress) "can impede [her] ability to function in the community...." (Tr. 620). It is not at all clear that these reports, if considered in isolation, demonstrate a marked impairment in at least two of the categories addressed by the "B" criteria - but, of course, they cannot be considered in isolation.

As the ALJ noted, Plaintiff's testimony indicated that she could shop for groceries, go out to eat, relate to family members and her home health aide (who was assisting her when she had her hip replaced), and do some household chores (although she was limited by her physical pain). Her sister-in-law completed a "Function Report - Adult Third Party" stating that she and Plaintiff were able, together, to do shopping, pay bills, and go to doctors' appointments and outings, that Plaintiff could bathe and feed herself, and that she did not need to be reminded to take medication. She could also put away dishes, fold clothes, run the vacuum, sing in a choir, and sew. She could talk with her mother on the phone and do school work online. Although that report mentions some psychologically-based symptoms as well, it is clear that the primary factor which was causing Plaintiff difficulty was pain. Dr. Williams, the state agency reviewer,

considered this and other evidence and concluded that any difficulties in activities of daily living were mild, and any difficulties in social functioning were moderate.  While it could be debated whether this evidence showed only mild difficulties in activities of daily living due to psychological symptoms, the record does support a finding that such difficulties were, at most, moderate rather than marked.  The record also contains substantial support for finding only moderate restrictions in social functioning.  Consequently, the ALJ did not err in concluding that Plaintiff did not satisfy the "B" criteria.

### C.  Listings 1.02A and 1.03

Similar to her arguments about the mental impairment section of the Listing, Plaintiff contends that the ALJ was required to find that she met either Section 1.02A or Section 1.03 due to her bilateral hip replacements.  Those sections presume disability when a claimant has a major dysfunction of a joint characterized by gross anatomical deformity which, among other things, prevents the claimant from "ambulat[ing] effectively," (Section 1.02A) or when a claimant does not or cannot return to "effective ambulation" within twelve months of reconstructive surgery or surgical arthrodesis of a major weight-bearing joint (Section 1.03).  She points out that she had both hips replaced, one in 2009 and one in 2010, and that various treatment notes showed that she was having difficulties with walking and balancing.

Again, Plaintiff's argument is focused solely on the evidence that might support a finding that she satisfied these sections of the Listing, and not on the more nuanced question of whether the evidence as a whole - including any evidence that she did not meet the Listing - is so compelling as to permit only one reasonable conclusion to be drawn.  The ALJ cited to additional evidence bearing on this issue, and the question is whether that evidence, when considered along with the favorable evidence relied on by Plaintiff, reasonably permits the opposite inference

to be drawn.  As the Court of Appeals has often noted, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  See Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001).

    Here, the ALJ specifically analyzed only Section 1.02, and only that part of the section which contains the requirement that the claimant have gross anatomical deformities such as joint space narrowing, bony destruction, or ankylosis of the affected joint.  The ALJ found no such evidence in the record, and concluded for that reason that Plaintiff did not meet that section of the Listing.  (Tr. 16).  The only evidence cited by Plaintiff which would appear to contradict that finding is an image of her left hip, read on February 2, 2010, which showed severe osteoarthritic changes in the hip with complete loss of normal joint height on the superior surface of bone on bone contact.  (Tr. 603).  That could be interpreted as evidence of joint space narrowing.  However, that image was taken before Plaintiff's left hip was replaced, so its significance in terms of the criteria listed in Section 1.02 is questionable.

    Further, the ALJ engaged in an extensive analysis of Plaintiff's ability to walk after her hip replacements when he discussed her residual functional capacity.  There, he noted that when she waw Dr. LeMay on January 7, 2010, she was "doing great" with respect to her prior hip replacement.  (Tr. 556).  A follow-up image with respect to her left hip showed no gross complications from surgery.  (Tr. 460).  A note from the Ohio Heart Group dated July 19, 2010, said that she was "doing fairly well" after the surgery, was exercising, walking regularly, and attempting to get involved in an exercise program at the YMCA. (Tr. 576).  The only evidence which Plaintiff cites from this same time period (post-left hip replacement) is a single note from her home health aide dated September 9, 2011, which sets

forth, as an "[a]dditional diagnosis(es) and/or problems": "Falls risk, Difficult mobility." (Tr. 730). Clearly, the evidence falls far short of being so one-sided on the issue of either joint deformation or inability to ambulate effectively that it compels only one conclusion. The ALJ had a substantial basis for his findings on this issue.

### D. Credibility

Finally, Plaintiff takes issue with the ALJ's finding that her testimony and reports of disabling symptoms was not entirely credible. She faults the ALJ for relying "solely upon Plaintiff's daily activities" as a reason for discounting her testimony, asserting that such an approach contravenes the principle that a claimant who can perform some modicum of activities of daily living may still be disabled. See, e.g. Walston v. Gardner, 381 F.2d 580 (6th Cir. 1967).

It is true that a social security ALJ is not permitted to reject allegations of disabling symptoms, including pain, solely because objective medical evidence is lacking. Rather, the ALJ must consider other evidence, including the claimant's daily activities, the duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, medication (including side effects), treatment or therapy, and any other pertinent factors. 20 C.F.R. §404.1529(c)(3). Although the ALJ is given wide latitude to make determinations about a claimant's credibility, the ALJ is still required to provide an explanation of the reasons why a claimant is not considered to be entirely credible, and the Court may overturn the ALJ's credibility determination if the reasons given do not have substantial support in the record. See, e.g. Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994).

As this statement of the law suggests, an ALJ may take activities of daily living into account in making a credibility determination, especially if those activities appear inconsistent

with the Plaintiff's own reports of what she can and cannot do. Further, this is not a case where the ALJ relied solely on the fact that Plaintiff could do some household chores in order to deny her benefits. Rather, the ALJ engaged in an extensive analysis of various credibility factors, including Plaintiff's past criminal record, the fact that she appeared to have misappropriated her children's benefit checks, that her reports about when she was taking classes were inconsistent, that she had a history of missing appointments and not complying with treatment recommendations, and that she had both a lengthy history of substance abuse and made contradictory statements about it. Under these circumstances, the ALJ provided a satisfactory and reasonably supported analysis of the credibility issue, and this Court is therefore not free to disturb his findings. See, e.g., Jones v. Comm'r of Social Security, 336 F.3d 469, 476 ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying").

### E. Other Issues

Although not identified as a specific error, at the end of the discussion about credibility, Plaintiff includes a single paragraph raising a question about the ALJ's rationale for giving no weight to Dr. Lee's opinion. The ALJ provided various reasons for preferring Dr. Williams' views over those of any treating or examining source; one was his conclusion that the handwriting on Dr. Lee's report was similar to Plaintiff's, and that "this form was completed not by Dr. Lee, but by the claimant herself. As such, I gave the opinion rendered in this form no weight as I do not believe it was completed by the claimant's doctor." (Tr. 26). As an exhibit to her statement of errors, Plaintiff attached a letter from Dr. Lee indicating that his assistant filled out the form and that he concurred in the opinions stated

-15-

there.  She amplifies this argument in her reply, contending for the first time that the ALJ did not have valid reasons for rejecting this opinion even if it were considered to have been rendered by Dr. Lee.

   Perhaps because this claim was not stated or designated as a separate assignment of error, and because Plaintiff made no argument in her statement of errors (as opposed to the reply) about the ALJ's evaluation of treating source opinions other than her effort to validate the form completed on Dr. Lee's behalf, the Commissioner's memorandum makes almost no mention of this issue.  It is briefly discussed in connection with Plaintiff's argument about the Mental Impairment Listings, but the Commissioner does not address the application of the treating source rule as it relates to the ALJ's specific rejection of Dr. Lee's opinion.

   The Court does not believe that any part of this issue other than the authenticity of Dr. Lee's report has been properly raised.  Ordinarily, issues presented for the first time in a reply brief will not be considered by the Court.  "This Court has explained time and again that 'a reply brief is not the proper place to raise an issue for the first time.'"  <u>Tonquette v. Sun Life and Health Ins. Co. (U.S.)</u>, 2013 WL 1818620, *4 (S.D. Ohio April 29, 2013).  However, the Court has concern about the ALJ's use of his own non-expert handwriting analysis as a basis for disregarding evidence in a case, especially evidence from a treating source.  If that were the only reason evident in the record why the ALJ gave no weight to Dr. Lee's opinion, the Court might well find that the ALJ's decision on that precise point was not reasonably supported, and that the ALJ should have developed the record further by asking for some verification about the report before declaring it to be a forgery.

   Here, however, any error in that regard is harmless.  The ALJ also had before him similar reports of extreme limitations

(perhaps even more extreme than those noted by Dr. Lee) from Dr. Weaver and Dr. Mason.  He rejected them in favor of Dr. Williams' opinion for various reasons, including the fact that Plaintiff engaged in a wide range of activities inconsistent with these assessments, including taking college classes online and going to church, dining out with her family, and going to exercise classes at the Y.  Additionally, he noted that she had applied for jobs and had disregarded medical treatment advice.  Had the ALJ considered Dr. Lee's opinion to be authentic, he would, as he stated at Tr. 25, have discounted it substantially as "inconsistent with the evidence as a whole...."  The Court is therefore persuaded that the error the ALJ committed in deeming the form to have been completed by Plaintiff and not by or on behalf of Dr. Lee did not affect his decision.  Because Plaintiff did not properly raise any other issues about the ALJ's treatment of that evidence, the Court will not analyze the questions (which are the usual ones raised when a treating source opinion is not given controlling or significant weight) of whether the ALJ both had and articulated valid reasons for his rejection of the treating source opinion.  See Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner of Social Security.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those

-17-

portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge